FINLEY v. BARKER.

1. ANIMALS—DOGS — CONSTITUTIONAL LAW — KILLING UNLICENSED DOGS.

Statutory authority to kill unlicensed dogs, which necessarily deprives the owner of them, does not in itself render unconstitutional a law (Act No. 339, Pub. Acts 1919) enacted under the police power of the State for their regulation and license, although dogs are recognized, in a qualified sense, as property which may be subject to larceny. FELLOWS, C. J., and BIRD, J., dissenting.

2. SAME — STATUTES — TRESPASSING NOT REQUIRED TO KILL UNLICENSED DOGS.

The provision in section 17 of Act No. 339, Pub. Acts 1919, making it the duty of the sheriff or any member of the State constabulary to locate and kill all unlicensed dogs after receiving a report thereon from the county treasurer, held, under a reasonable construction within constitutional bounds, not to require trespassing upon the private premises of the owners of the dogs for the purpose of killing them.

3. SAME—KILLING DOGS RUNNING AT LARGE.

The provision of said section 17 requiring the sheriff, on complaint of the prosecuting attorney, to kill any dog that is in the habit of running at large unaccompanied by the owner or his agent, held, unreasonable and unconstitutional.

4. SAME — LICENSED DOGS—OWNER ENTITLED TO NOTICE BEFORE KILLED.

Since a presumption of value attends a licensed dog, an owner who has obtained a license therefor is entitled to notice and a hearing before his dog is killed for merely running at large.

5. SAME—DOG LICENSES—AUTHORITY TO ISSUE AT ANY TIME.

In view of all the provisions of Act No. 339, Pub. Acts 1919, and the plain purpose of the act, authority to issue dog licenses thereunder after June 15th remains in the county treasurer, although specific authority to do so is

not given and on that date he is required to report all unlicensed dogs to the sheriff and prosecuting attorney for their official action.

6. SAME—INJUNCTION—KILLING OF DOGS PROPERLY RESTRAINED ON TENDER OF LICENSE FEES.

In a suit to restrain the killing of plaintiff's dogs by defendant county officers under authority of Act No. 339, Pub. Acts 1919, where it was conceded that plaintiff had tendered to defendants the proper amount required thereunder for licenses, a decree in favor of plaintiff was justified, although tender was not made until after the date when said dogs might legally have been killed.

Appeal from Van Buren; Des Voignes (L. Burget), J. Submitted April 13, 1922. (Docket No. 60.) Decided July 20, 1922.

Bill by Lucian Finley against Dwight C. Barker and others to enjoin the destruction of certain unlicensed dogs. From a decree for plaintiff, defendants appeal. Affirmed.

*Harry C. Howard,* for plaintiff.

*James E. Chandler,* Prosecuting Attorney, for defendants.

STEERE, J. Defendants are county officers of Van Buren county, Duncombe being county treasurer, Barker sheriff, and Chandler prosecuting attorney. Upon each duties are imposed in the administration and execution of Act No. 339, Pub. Acts 1919. In former years various so-called dog laws of the State and Territory of Michigan have been enacted from time to time, beginning as early as 1805, but this one the legislature introductorily declared in its section 1, "shall be known and may be cited as the dog law of nineteen hundred and nineteen of the State of Michigan."

Plaintiff resided upon and owned a farm in Almena

township in said county. He kept there, and owned, five dogs of various ages, whose lives were put in jeopardy by defendants' activities in performance of their respective duties under said act, impelled thereto by the fact that plaintiff had neglected to timely pay license fees for the current year and procure protective insignia for his dogs to wear as required by said dog law. Failing in a belated effort to pay the license fees and save his dogs before the sheriff located and destroyed them as public nuisances, he filed this bill of complaint and secured a temporary injunction protecting his dogs pending the hearing. When the case was heard the court denied plaintiff's attack upon the constitutionality of the law but construed the act as permitting him to obtain licenses for his dogs at the time he made application to the county treasurer and tendered payment therefor. With this he was apparently content. Questioning the court's construction of the act defendants appealed. Denying certain of plaintiff's inferences and legal conclusions, defendants admit in their answer the material facts stated in his bill of complaint sufficient to fairly present the questions argued. The case was submitted without proofs by stipulation of counsel, on the pleadings.

It is shown by plaintiff's bill that he has been a resident of Van Buren county for over 50 years, has during that time owned and kept at his home in Almena township many dogs for which he always paid taxes and secured licenses as the laws required, in all respects complying with existing acts upon that subject; that the dogs he now owns are valuable animals for which he intended and was desirous of securing licenses and complying with the law as to them; for that purpose he went to defendant Duncombe, the county treasurer, on, or about, both July 11 and 12, 1921, and unsuccessfully made application

to him for licenses for the five dogs he kept on his farm, stating age, breed, markings, etc., and on July 14, 1921, he again made application to the county treasurer for such licenses in writing, tendering him $21 in lawful money of the United States therefor, but on each of said dates the treasurer refused to accept his tender or to favorably consider his application; therefore he brings into court the said sum of $21, being the lawful fees for such licenses and "stands ready and willing to pay any other or further sum required by law as fees for licenses for said dogs;" that as a result of the county treasurer's refusal his dogs are without licenses and liable to be killed, and he to be prosecuted for keeping them; that defendant Chandler threatens as prosecuting attorney to institute proceedings against him for violating said act and defendant Barker as sheriff threatens to kill his unlicensed dogs, which he fears and has good reason to believe they will do. Finding himself and his dogs in that uncomfortable situation without adequate remedy at law, he appeals to the chancery court for relief.

Plaintiff concedes the facts stated in paragraph 9 of defendants' answer, which fairly presents their position as follows:

"Answering the 9th paragraph of said bill of complaint, defendants admit the allegations therein contained and say that on the 10th day of January, 1921, and on each and every day between that day and to-wit: the 15th day of June, 1921, when the county treasurer of said county made his return to the sheriff and the prosecuting attorney of said county of the dogs therein on which license fees had not been paid and for which licenses had not been applied, the said Lucian Finley was the owner of the dogs described in paragraph 7 of said bill of complaint and had not applied for or paid the license fees on any of said dogs up to said 15th day of June, 1921, and on making the aforesaid reports to

the said sheriff and prosecuting attorney of the unlicensed dogs within the limits of the county of Van Buren, the said county treasurer thereafter refused to accept license fees and issue licenses on dogs after said day for the reason that under the so-called dog law of 1919 he was without authority to receive the money of the said Lucian Finley and issue him licenses applied for on the aforesaid dogs."

The act under consideration indicates legislative recognition that former dog laws administered by independent local officials were often more honored in the breach than in observance and enforcement, which it was the intent to remedy by providing State control. Section 4 of the act gives supervision over licensing and regulation of dogs to the State live stock sanitary commission with authority to employ all proper means for enforcement of the act, and "All police officers of the State, county, municipality or township" are put at its disposal for that purpose. By section 26 police officers failing or refusing to comply with any provision of the act are made guilty of a misdemeanor, and subject to fine and imprisonment.

License tags, blank forms and books for registration are to be furnished by the State treasurer under direction of the commission to each county treasurer before the first of the year, who is himself authorized to issue licenses and on application to furnish tags, blanks, etc., to city and township treasurers for issuance by them. They are required to account and report to him. He is required to keep a complete record of all licenses issued in the county during the year with specific data as to locality, description of dog, owner, etc. Every supervisor and city assessor is required when making his assessment to take a census of dogs and dog owners in his assessment district, and make a complete report of the same, on blank forms furnished by the live stock commission,

to the county treasurer on or before June 1st of each year, for which such assessor receives a fee for each dog reported.  Owners of dogs are required to apply for licenses on or before January 10th.  While in default for not so doing, with their unlicensed dogs outlawed, the act does not in express terms forbid issue of licenses to them thereafter on proper application and payment therefor.  The program provided for conducting and rounding up the business gives color to the contention that a belated owner may save his dog if yet alive by proper application and payment of the annual license fee until at least June 15th when the open season for unlicensed dogs and imperative action by the officers to make it effectual appears to be provided by section 17 of the act, as follows:

"On June fifteenth of nineteen hundred twenty and each year thereafter, each county treasurer shall make a comparison of his records of the dogs actually licensed in each city or township of his county with the report of the supervisor of said township or assessor of said city, to determine and locate all unlicensed dogs.  On and after June 15th of each year every unlicensed dog, subject to license under the provisions of this act, is hereby declared to be a public nuisance and the county treasurer shall immediately thereafter list all such unlicensed dogs, as shown by the returns in his office of the supervisors and assessors, and shall deliver copies of such lists to the sheriff and prosecuting attorney of said county.  On receiving from the county treasurer the name of any owner of any unlicensed dog, the prosecuting attorney shall at once commence the necessary proceedings against the owner of said dog, as required by the provisions of this act.  It shall also be the duty of the sheriff or any member of the State constabulary to locate and kill, or cause to be killed, all such unlicensed dogs.  Failure, refusal or neglect on the part of any sheriff to carry out the provisions of this section shall constitute nonfeasance in office.  The sheriff shall also kill, on complaint from the prosecuting attorney, any dog that is in the habit of

running at large unaccompanied by owner or his agent."

This section is complained of by plaintiff as drastic, harsh, unreasonable and unconstitutional because it gives officers power to locate and kill an unlicensed yet valuable and harmless dog even if in charge of or confined on the premises of its owner, and thereby deprive him of his property without due process of law.

Statutory authority to kill unlicensed dogs, which necessarily deprives the owner of them, does not in itself render unconstitutional a law enacted under the police power of the State for their regulation and license. Though not at common law regarded as subjects of larceny, dogs have by statutory provision and court construction come to be quite generally recognized as in their nature and relations with man "goods or chattels" and in a qualified sense property which may be subject to larceny as defined by statute.

"Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the State without depriving their owners of any Federal right." *Nicchia* v. *New York*, 254 U. S. 228 (41 Sup. Ct. 103, 13 A. L. R. 826).

In *Sentell* v. *Railroad Co.*, 166 U. S. 698 (17 Sup. Ct. 693), the subject is instructively discussed by Justice Brown in part as follows:

"The very fact that they are without the protection of the criminal law shows that property in dogs is of an imperfect or qualified nature, and that they stand, as it were, between animals *feræ naturæ* in which, until killed or subdued, there is no property, and domestic animals, in which the right of property is perfect and complete. * * * They have no intrinsic value, by which we understand a value common to all dogs as such, and independent

of the particular breed or individual. Unlike other domestic animals, they are useful neither as beasts of burden, for draught (except to a limited extent), nor for food. They are peculiar in the fact that they differ among themselves more widely than any other class of animals, and can hardly be said to have a characteristic common to the entire race. While the higher breeds rank among the noblest representatives of the animal kingdom, and are justly esteemed for their intelligence, sagacity, fidelity, watchfulness, affection, and, above all, for their natural companionship with man, others are afflicted with such serious infirmities of temper as to be little better than a public nuisance. All are more or less subject to attacks of hydrophobic madness. * * * Acting upon the principle that there is but a qualified property in them and that, while private interests require that the valuable ones shall be protected, public interests demand that the worthless shall be exterminated, they have, from time immemorial, been considered as holding their lives at the will of the legislature, and properly falling within the police powers of the several States."

Various authorities are cited and reviewed in that opinion supporting the general proposition that destruction of unlicensed dogs pursuant to specific statutory requirement is not in violation of the owner's constitutional property protection, but to regulate and control the use and keeping of such property in a manner deemed by the legislature reasonable and expedient in the public interest. The police power has been said to include regulations which authorize killing unlicensed dogs running at large, without notice to the owner. *Julienne* v. *City of Jackson,* 69 Miss. 34 (10 South. 43, 30 Am. St. Rep. 526) ; *Leach* v. *Elwood,* 3 Ill. App. 453; *Morey* v. *Brown,* 42 N. H. 373. But in *Kerr* v. *Seaver,* 11 Allen (Mass.), 151, it was said a provision in a dog law that "any person may, and every officer and constable shall kill or cause to be killed all such (unlicensed) dogs when-

219—Mich.—29.

ever and wherever found," did not authorize entering upon the owner's premises without leave and pursuing such dog into the house to capture it for that purpose.

In this State they have long been recognized as a proper subject for special and peculiar legislative regulation under its police power. *Van Horn* v. *People*, 46 Mich. 183 (41 Am. Rep. 159). In *Heisrodt* v. *Hackett*, 34 Mich. 283 (22 Am. Rep. 529), where a dog license law was under consideration which provided that "any person may, and it shall be the duty of any police officer and constable of any township or city to kill any and all dogs going at large and not licensed or collared according to the provisions of this act," it was appropriately suggested:

"The legislature, undoubtedly, in adopting this statute, contemplated that at least some judgment would be exercised by the person before killing the dog."

In *City of Hagerstown* v. *Witmer*, 86 Md. 293 (37 Atl. 965, 39 L. R. A. 649), where it was held provisions for summary destruction of dogs found running at large contrary to statute or ordinance were within the police power of the State and constitutional, the court said in commenting on the law under consideration:

"But while this is true, an ordinance embracing such drastic features should be very cautiously enforced. As many of the provisions of the one before us are, to say the least, severe, it should be construed liberally in favor of the owners of dogs, if any cases arise under it, and it ought not to be extended beyond what is absolutely required by its terms."

The provision in section 17 of this act making it the duty of officers to locate and kill or cause to be killed unlicensed dogs is of the class where "at least

some judgment" should be exercised in executing it, and by fair construction within constitutional bounds its reasonable execution does not require trespassing upon or invading the private premises of its owner for the purpose of killing his unlicensed but otherwise unoffending dog. We cannot agree with defendants' contention that such construction draws the teeth of the act and renders it ineffectual, for in the same section it authorizes and requires the prosecuting attorney to commence proceedings against the owner of the dog as required by the act, and the act makes the owner who has violated it by keeping an unlicensed dog guilty of a misdemeanor involving a fine of $100 and 90 days' imprisonment.

The closing provision of section 17 requiring the sheriff on the *ipse dixit* of the prosecuting attorney to kill *any* dog that is in the habit of running at large unaccompanied by an owner or his agent, if taken as it reads, to include licensed dogs, goes beyond reasonable regulations. "Running at large" is an idiomatical phrase of varied meaning. It is said to mean as applied to unconfined stock "strolling without restraint or confinement; rambling at will." *Eklund* v. *Toner*, 121 Mich. 687. A law which *ipso facto* forfeits for so doing without notice to his owner the life of a licensed dog otherwise well behaved and harmless, is unreasonable and unconstitutional. Only under special conditions are well broken dogs of good disposition kept in confinement. A presumption of value attends a licensed dog. The owner who has complied with the law, paid for and obtained a license entitling his dog to live, is at least entitled to notice and a hearing before the dog is killed.

The act does not in exact words say that the county treasurer may or may not issue licenses to all applicants throughout the year. It gives him the power to license and makes him the responsible licensing

officer of his county under general supervision of the State live stock sanitary commission, assisted by township and city treasurers made accountable to him. It provides that at stated times during the year certain things shall be done, which, standing alone, give room for the contention that the time for issuing licenses then terminates. But when taken in connection with other provisions and considered in the light of the plain purpose of the act such is not the necessary inference. The indicated intent running through the act is not to provide a period of the year in which owners of valuable or valued dogs cannot protect their lives by registering and procuring licenses for them, but rather by an early beginning of liability and increasing hazards make death of the dog an inevitable finality of failure to secure a license for him.

As a spur to prompt action the owner is required to get a license for his dog by January 10th, in default of which he is liable to criminal prosecution for keeping it without a license; annually, on January 25th, the township and city treasurers are required to account to the county treasurers for the licenses furnished them and fees collected; thereafter, when taxes are assessed in the spring, the tax assessors are required to take a census of dogs subject to license, with their owners, and report the same to the county treasurer by June 1st; on June 15th the treasurer is required to determine from his records and locate dogs then remaining unlicensed and furnish a list of them to the sheriff and prosecuting attorney, whose duties to prosecute and exterminate are then made imperative. The power to license, which was vested in the county treasurer, is not even then terminated by any express provision in the act, but on the contrary the treasurer is required to keep a record of all licenses "issued during the year," and by section 8 provision is made for his licensing after-acquired dogs

over four months old during the entire year.  Puppies under that age being exempt, the owner is required to secure licenses for them when they are four months old, "and in case of application made at any time after the 10th day of July of any year, the license fee shall be one-half the amount fixed as the annual license fee for such dog."

The severe and drastic features of this law are for a worthy purpose.  Former experience with milder dog laws points to the necessity of such provisions for their enforcement, but liberal construction and discreet enforcement of the more drastic features are permissible within the imperative requirements of its terms and efficient enforcement to accomplish its purpose.

In *State* v. *Tripp,* 84 Conn. 640 (81 Atl. 247), where a dog law specified on or before the 1st day of May in which application should be made to the town clerk for a license, the court said:

"Although the owner of a dog or kennel may be subjected to a penalty for not having applied for a license on or before May 1st of each year, his failure to do so would not render it illegal for the town clerk to afterward issue a license, as was done in this case, for the year following the first of May, upon payment of the full license fee for that year."

Although plaintiff may be subject to fine and imprisonment for previously keeping unlicensed dogs we conclude that his failure to do so would not affect the right of the county treasurer to issue him the licenses he later applied for on his payment of full license fees for that year, and are satisfied that under a fair construction of the law, considered in its entirety, authority yet remained with the treasurer to accept the fees and issue the licenses.  The purpose of the law was accomplished and the reason for killing the dogs no longer existed, although plaintiff by his

delinquency laid himself liable to prosecution and took the hazard of the officers performing their duty and exterminating his dogs until they were duly notified that licenses for them had been issued.

Owing to the somewhat obscure wording of the statute as applied to the position in which plaintiff's delay put them, defendants, as public officials, were justified in appealing for an interpretation of the act as to their rights and duties under it.

The decree will therefore stand affirmed, without costs.

WIEST, MCDONALD, CLARK, SHARPE, and MOORE, JJ., concurred with STEERE, J.

FELLOWS, C. J. (*dissenting*).    Dogs have been recognized as property and the subject of larceny in this State.    *Rockwell* v. *Oakland Circuit Judge,* 133 Mich. 11.    In my judgment the State may not destroy the property of its citizens upon the sole ground that taxes, either general or specific, upon it or license fees exacted have not been paid.    In so far as this law authorizes the killing of dogs whose owners have not paid the exacted fee, I think it is invalid.

BIRD, J., concurred with FELLOWS, C. J.